IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

FILED - CLERK
U.S. DISTRICT COURT

2001 JUN -8  PM 2: 02

TX EASTERN - LUFKIN

BY_____

| | | |
|---|---|---|
| P.D. HAMILTON, Individually and as | § | |
| Trustee of the Prentice Dell Hamilton and | § | |
| Florine Hamilton Family Trust | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. _9:0 / cv 132_ |
| | § | |
| KOCH INDUSTRIES, INC., Individually | § | JURY       Judge Hannah |
| and d/b/a KOCH HYDROCARBON | § | |
| COMPANY, KOCH PIPELINE | § | |
| COMPANY, L.P., KOCH PIPELINE | § | |
| COMPANY, L.L.C., GULF SOUTH | § | |
| PIPELINE COMPANY, L.P., | § | |
| GS PIPELINE COMPANY, L.L.C., | § | |
| ENTERGY-KOCH, L.P., and | § | |
| EKLP, L.L.C. | § | |

## PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, Plaintiff P.D. Hamilton, individually and as Trustee of the Prentice Dell

Hamilton and Florine Hamilton Family Trust, and on behalf of all other persons similarly situated,

and files his Original Complaint in this class action, and would respectfully show as follows:

I.
Parties

1.      Plaintiff P.D. Hamilton is a citizen of the State of Texas and Trustee of the Prentice

Dell Hamilton and Florine Hamilton Family Trust (hereinafter sometimes referred to as the "Trust").

The Trust owns property in Trinity County, the Eastern District of Texas, through which Defendants'

hazardous liquid pipeline runs.  Plaintiff is also the representative of a class of similarly situated

individuals and entities who are exposed to an imminent risk of harm and whose properties have

been and continue to be damaged due to the dangerous condition of Defendants' hazardous liquid and natural gas pipelines and Defendants' failure to safely maintain and operate such pipelines.

2.     Defendant Koch Industries, Inc., individually and doing business as Koch Hydrocarbon Company, is a corporation incorporated under the laws of the State of Kansas, with its principal place of business at 4111 East 37th Street North, Wichita, Kansas, 67220. Koch Hydrocarbon Company is the assumed name of Defendant Koch Industries, Inc. Defendant Koch Industries, Inc., individually and doing business as Koch Hydrocarbon Company, conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas, 75201.

3.     Defendant Koch Pipeline Company, L.P. is a Delaware limited partnership, with its principal place of business at 4111 East 37th Street North, Wichita, Kansas, 67220. Defendant Koch Pipeline Company, L.L.C. is the general partner of Defendant Koch Pipeline Company, L.P. Defendant Koch Pipeline Company, L.L.C. is a Delaware limited liability company, with its principal place of business at 4111 East 37th Street North, Wichita, Kansas, 67220. Defendant Koch Pipeline Company, L.P. conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 1021 Main Street, Suite 1150, Houston, Texas, 77002.

4.     Defendant Koch Pipeline Company, L.L.C. is a Delaware limited liability company, with its principal place of business at 4111 East 37th Street North, Wichita, Kansas, 67220. Defendant Koch Pipeline Company, L.L.C. is the general partner of Defendant Koch Pipeline Company, L.P. Defendant Koch Pipeline Company, L.L.C. conducts substantial business in the

366498.1 1761/1

State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas, 75201.

5.      Defendant Gulf South Pipeline Company, L.P. is a Texas limited partnership, with its principal place of business at 20 East Greenway Plaza, Houston, Texas 77252-2768. Defendant GS Pipeline Company, L.L.C. is the general partner of Defendant Gulf South Pipeline Company, L.P. Defendant GS Pipeline Company, L.L.C. is a Delaware limited liability company, with its principal place of business at 20 East Greenway Plaza, Houston, Texas 77252-2768. Defendant Gulf South Pipeline Company, L.P. conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

6.      Defendant GS Pipeline Company, L.L.C. is a Delaware limited liability company, with its principal place of business at 20 East Greenway Plaza, Houston, Texas 77252-2768. Defendant GS Pipeline Company, L.L.C. is the general partner of Defendant Gulf South Pipeline Company, L.P. Defendant GS Pipeline Company, L.L.C. conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas, 75201.

7.      Defendant Entergy-Koch, L.P. is a Texas limited partnership, with its principal place of business at 20 East Greenway Plaza, Houston, Texas 77252-2768. Defendant Entergy-Koch, L.P. is the parent company of Defendant Gulf South Pipeline Company, L.P. Defendant EKLP, L.L.C. is the general partner of Defendant Entergy-Koch, L.P. Defendant EKLP, L.L.C. is a Delaware limited liability company, with its principal place of business at 20 East Greenway Plaza, Houston,

Texas 77252-2768. Defendant Entergy-Koch, L.P. conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

8. Defendant EKLP, L.L.C. is a Delaware limited liability company, with its principal place of business at 20 East Greenway Plaza, Houston, Texas 77252-2768. Defendant EKLP, L.L.C. is the general partner of Defendant Entergy-Koch, L.P. Defendant EKLP, L.L.C. conducts substantial business in the State of Texas and the Eastern District of Texas, and may be served with process through its registered agent for service in Texas, CT Corporation System, 350 North St. Paul Street, Dallas, Texas, 75201.

## II.
## Jurisdiction

9. Jurisdiction is proper in this Court pursuant to 49 U.S.C. § 60121(a) and 28 U.S.C. §1331. 49 U.S.C. § 60121(a) states in pertinent part that "[a] person may bring a civil action in an appropriate district court of the United States for an injunction against another person . . . for a violation of this chapter or a regulation prescribed or order issued under this chapter."

## III.
## Venue

10. Venue is proper in this division of the Eastern District of Texas pursuant to 28 U.S.C. §1391(b) and (c) in that Defendants reside in the Eastern District of Texas, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Eastern District of Texas, and a substantial part of the property damaged that is the subject of this action is situated in the Eastern District of Texas.

V.
Relationship of the Defendants

11.     Whenever it is alleged that Defendants did or failed to do any particular act or comply

with any law in this complaint, it is meant that the Defendants, acting by and through their

authorized agents, representatives, employees and/or vice-principals, did or failed to do that act in

the course and scope of their employment and in furtherance of their employer's business.

12.     Whenever it is alleged that a Defendant did or failed to do any particular act or

comply with any law in this complaint, it is meant that Defendant Koch Industries, Inc. acted or

failed to act through its alter ego(s) and that all corporate fictions of Koch Industries, Inc. including

Koch Hydrocarbon Company, Koch Pipeline Company, L.P., Koch Pipeline Company, L.L.C., Gulf

South Pipeline Company, L.P., GS Pipeline Company, L.L.C., Entergy-Koch, L.P. and/or EKLP,

L.L.C. should be disregarded for the following reasons which are pled collectively, separately and

disjunctively in the alternative:

    a.     the above listed corporate fictions or entities of Koch Industries, Inc. are
        organized and operated as a mere tool or business conduit for Koch
        Industries, Inc.;

    b.     the above listed corporate fictions or entities are a single business enterprise
        or joint enterprise; and/or

    c.     the above listed corporate fictions or entities of Koch Industries, Inc. are
        employed as a means of evading existing legal obligations.

13.     In the alternative, in the event that the alter ego corporate fictions listed above of

Koch Industries, Inc. are not disregarded, Plaintiff's allegations herein are pled to mean that each of

the acts and omissions and causes of actions of Plaintiff against the Defendants are pled against each

individual Defendant singularly and collectively. Hereinafter Defendants are collectively referred to as "Koch."

V.
Factual Allegations

14.     Koch produces, gathers, processes, transports and distributes natural gas and hazardous liquids, such as ethane, propane, butane and iso-butane, through a network of pipelines and pipeline facilities across several states in the United States.

15.     Koch's network of natural gas and hazardous liquid pipelines and pipeline facilities transverse the State of Texas and the Eastern District of Texas, as well as the States of Kansas, Oklahoma, Louisiana, Alabama, Mississippi and Florida. There may be other states through which Koch's natural gas and hazardous liquid pipelines run; however, it is believed at this time that the Department of Transportation and the Office of Pipeline Safety may not even have current geographical maps identifying the location of all natural gas and hazardous liquid pipelines owned and/or operated by Koch.

16.     Koch's network of hazardous liquid pipelines is extensive and includes the Chaparral pipeline and the Sterling I and II pipelines. The Chaparral pipeline gathers mixed liquids of ethane plus and ethane/propane from Wyoming, New Mexico, and Texas for delivery to the Texas Gulf Coast. The Sterling I and II pipelines transport liquid ethane, butane, propane and/or iso-butane from Medford, Oklahoma to Mont Belvieu, Texas.

17.     Koch's Sterling I and Sterling II pipelines enter the State of Texas in Grayson County, with the Sterling II pipeline continuing through Collin, Hunt, Kaufman, Van Zandt, Henderson, Anderson, Houston, Trinity, Polk, San Jacinto, Liberty and Chambers Counties. The Sterling I

pipeline continues through the Texas counties of Fannin, Collin, Rockwall, Kaufman, Henderson, Navarro, Freestone, Leon, Madison, Grimes, and Montgomery.  The Chaparral pipeline transverses the Texas counties of Andrews, Martin, Howard, Borden, Scurry, Fisher, Nolan, Taylor, Callahan, Brown, Comanche, Hamilton, Coryell, McLennan, Falls, Milam, Robertson, Brazos, Grimes, Montgomery, Harris and Liberty.

18.     Koch owns and/or operates several thousand miles of interstate hazardous liquid pipelines across the States of Texas, Oklahoma and Kansas.  Koch's hazardous liquid pipeline system also transports approximately 100,000 barrels of hazardous liquids per day across the State of Texas.

19.     Koch's hazardous liquid pipelines have corrosion and have had numerous leaks or ruptures.  Further, Koch has failed to take action necessary to safely maintain and operate its hazardous liquid pipelines and to comply with the Hazardous Liquid Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* (hereinafter the "Pipeline Safety Act") and the prescribed regulations implementing such Act.

20.     Koch owns and/or operates approximately 10,000 miles of interstate natural gas pipelines across the States of Texas, Louisiana, Alabama, Mississippi and Florida.  Many of these lines were purchased by Koch from United Gas Pipeline Company around 1992.  Many of these natural gas lines were very old when purchased by Koch and in need of repair.  Although Koch was aware of the problems with these natural gas pipelines, it did not take action after the purchase to recondition or repair the lines.

21.     Koch's natural gas pipelines have corrosion and have had numerous leaks or ruptures. Further, Koch has failed to take action necessary to safely maintain and operate its natural gas

pipelines and to comply with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act.

22.     Defendant Koch Industries, Inc. is the parent company of the other Koch Defendants, and/or controls the operations of these Koch entities.  Further, Defendant Koch Industries, Inc. determines the policies and procedures regarding the operation and maintenance of the natural gas and hazardous liquid pipelines, including the Defendants' common or uniform practice of following Market-Based Management®.

23.     Koch's Market-Based Management® system is the creation of Charles Koch, Chairman and Chief Executive Officer of Defendant Koch Industries, Inc.

24.     Koch has engaged and is continuing to engage in a common pattern, practice and scheme of failing to safely maintain and operate its natural gas and hazardous liquid pipelines to maximize corporate profits. The purpose of Koch's company-wide practice of following Market-Based Management® is to avoid or delay financial expenditures necessary to comply with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act to increase its corporate profits. As a result of this company-wide policy and practice, Koch's natural gas and hazardous liquid pipelines have seriously deteriorated in condition and expose Plaintiff and the class members to imminent risk of harm.

25.     Employees are trained in Koch's centralized policy of Market-Based Management®, which requires every decision to be made based upon the economic effect it would have on the companies and whether it would be profitable for Koch.  Koch employees are directed and required to cut costs to increase profits, including costs essential and necessary to safely maintain and operate Koch's natural gas and hazardous liquid pipelines.  Indeed, Koch employees receive more training

in Market-Based Management® than in how to properly maintain and operate Koch's natural gas and hazardous liquid pipelines.

26.     Employees are encouraged not to spend money on pipeline integrity or repair because the cost of such financial expenditures would not be recouped by Koch for many years. Although Koch knows that its pipelines are dangerous and could cause serious personal injury or death if a natural gas or hazardous liquid pipeline were to rupture, Koch employees have been told it is cheaper to pay a lawsuit or fine than repair the pipelines.

27.     Koch management has also bragged that its use of Market-Based Management® has benefitted Koch with a consistent record of profitable growth significantly above the industry average. Unfortunately, this financial benefit to Koch has come at the expense of Plaintiff, the class members, and even the general public who are exposed daily to the dangerous condition of Koch's natural gas and hazardous liquid pipelines.

28.     Virtually all decisions made by Koch regarding the maintenance and operation of its natural gas and hazardous liquid pipelines are based upon Market-Based Management®. These decisions include those relating to the detection and prevention of corrosion of their natural gas and hazardous liquid pipelines, as well as the repair and replacement of its pipelines. Moreover, employee incentives and bonuses are often based on whether the employee has cut costs thereby increasing Koch's profits. Koch employees are constantly reminded that profitability is most important.

29.     Koch's strict adherence to Market-Based Management® is directly opposed to a management program which emphasizes pipeline integrity and compliance with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act. Because Koch

imposes and follows a company-wide policy emphasizing corporate profits over pipeline integrity, Koch's natural gas and hazardous liquid pipelines expose Plaintiff and the class members to imminent risk of harm.

30.     Koch's failure to safely maintain and operate its hazardous liquid pipelines in order to cut costs and ensure higher corporate profits has resulted in the corrosion of Koch's natural gas and hazardous liquid pipelines and has caused numerous leaks, spills, failures and/or ruptures in Koch's pipelines.  For example, on August 24, 1996, the Sterling I pipeline ruptured allowing 400,000 gallons of liquid butane to escape and form a butane vapor cloud in the residential area of Oak Circle Estates in Kaufman County, Texas.  The tear at the rupture point was the result of corrosion.

31.     The Sterling I pipeline is an 8-inch diameter steel pipeline transporting 25,000 barrels of liquid butane per day from Medford, Oklahoma to Mont Belvieu, Texas.  Liquid butane is a highly volatile liquid petroleum product that vaporizes at atmospheric pressure and room temperature. Upon release, the liquid vaporizes into a highly flammable white or nearly transparent fog-like cloud. Because the vapor is heavier than air, it stays close to the ground and settles into low-lying areas.

32.     On the afternoon of August 24, 1996, Danielle Smalley was at home packing for college and visiting with her friend, Jason Stone. Danielle told her father that she and Jason smelled gas and it was making her sick to her stomach. Because the source of the gas smell was unknown, Danielle and Jason decided to drive to a neighbor's home to report a gas leak and to warn others. Danielle and Jason got in the Smalley truck and drove down the road.   The truck stalled in a low spot on the road where a gaseous vapor cloud had formed. Danielle then tried to restart the truck and when she did the fire and explosion ignited. Danielle Smalley and Jason Stone died as a result of

PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT - PAGE 10          366498.1 1761/1

the fire and explosion. Numerous Texas residents who owned property in the surrounding area also sustained substantial property damage as a result of the fire and explosion.

33.     The Kaufman County disaster was the result of the corroded condition of Koch's Sterling I pipeline. A metal pipeline is protected from corrosion by two methods, coating and cathodic protection.

34.     Barrier coating is applied to keep soil and moisture away from the pipe and to form an electrical barrier to keep forces from traveling to or from the pipe resulting in corrosion. Factors such as improper surface preparation or improper application of the primer or coating may result in coating disbondment. If soil or moisture is present on the pipe surface underneath the disbonded coating, the pipe can corrode even if adequate cathodic protection is being supplied.

35.     Cathodic protection is a corrosion mitigation method used by the pipeline industry to protect underground metal pipes using rectifier stations along the pipeline that supply protective electrical current. Cathodic protection current is forced to flow in the opposite direction of currents produced by corrosion cells. A rectifier converts alternating current from the utility service to direct current and supplies it to a ground bed that typically contains a string of suitable anodes, with soil as an electrolyte, to provide a path for the current from the rectifier to the pipeline.   A cable connected to the pipeline provides the return path to the circuit. A ground bed is a piece of metal that is put in the ground so that the metal is sacrificed or eaten up rather than the pipeline.   The positive flow of electrons from the metal buried in the ground to the pipeline prevents the metal on the pipeline itself from being corroded away or leaving the pipeline by pushing electrons toward the pipeline, so that the pipeline itself is not deteriorating.

36.     Pipeline operators such as Koch are required by the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act to maintain adequate cathodic protection. Pipe-to-soil readings are taken to ensure that the pipeline operator's cathodic protection system is working properly and effectively protecting the pipe from corrosion. The minimum industry standard and Koch's own standard of protection require a current of at least .85 volts flowing toward the pipe.

37.     The Sterling I pipeline was constructed in 1981 in very wet conditions. Koch applied a tape coating, similar to electrical tape, to sections of the pipe as it was being installed. Prior to the Kaufman County explosion, Koch management knew the Sterling I pipeline was improperly laid in the rain and that there were coating problems. Koch's first annual survey of the pipeline in 1982 recorded low cathodic protection levels below the minimum .85 volts. Subsequent readings of low cathodic protection near the rupture site were recorded in 1984 and 1985.

38.     Throughout the mid to late 1980s, there were several instances in which digs were made near the rupture site and disbonded or damaged coating was observed and documented by Koch. In 1990, Koch conducted six random digs in Kaufman County to inspect the Sterling I pipeline. At all six locations or sections of the pipeline, Koch found coating that was disbonded and not protecting the pipe. In 1991, the corrosion supervisor for Sterling I reported to Koch that the coating on the Sterling I pipeline near the rupture site was aged and deteriorating and that Koch should expect a greater increase in the current or cathodic protection requirement. In 1991, Koch was also aware that the M8 rectifier, near the rupture site, was down and not providing cathodic protection.

39.     The Sterling I pipeline was taken out of service in 1993.  Around 1994, Koch decided to place Sterling I back in operation and estimated a gross profit of 7.6 million dollars per year for the first 15 years from the increased transportation of liquid butane.  The Sterling I pipeline actually began operating again in January 1996.  However, prior to reopening the pipeline, Koch knew that the condition of the pipeline at and near the rupture site in Kaufman County, Texas was dangerous. Koch was aware that there was disbonded and damaged coating, that the cathodic protection system was dying, and that the pipe was corroded.

40.     In March 1995, Koch knew the M-9 rectifier, the closest rectifier to the Kaufman County, Texas rupture site, was being depleted and that the ground bed was being used up and would soon be useless.  In April 1995, Koch conducted a hydrostatic test that failed.  A hydrostatic test was performed by filling the pipeline with water and running the water through the pipe at a certain pressure to see if the pipe would hold.  The first hydrostatic test failed because the pipe burst in Kaufman County as a result of corrosion.

41.     In May 1995, Koch conducted a low-resolution smart pig test to determine the overall condition of the Sterling I pipeline.  A smart pig is an electronic device that it pumped through the pipe to take readings from inside of the pipeline and provides data regarding the condition or integrity of the pipeline, including wall thickness and corrosion of the pipeline. The low-resolution smart pig test identified 583 defects in the Sterling I pipeline with 15 percent or greater loss of wall thickness.   By industry standards, the Sterling I pipeline was described as being like swiss cheese. Koch only attempted to repair 80 of the 583 defects, limiting its repairs to those corrosion defects identified as moderate (30 percent to 50 percent loss of wall thickness) and severe (greater than 50 percent loss of wall thickness).

366498.1 1761/1

42.     During the digs to conduct the limited repairs of the Sterling I pipeline, Koch also found corrosion, disbonded coating and low cathodic protection readings on the pipeline. The M-9 rectifier, the closest rectifier to the rupture site, was down in September 1995.   In February 1996, Koch knew that its cathodic protection system near the rupture site was dying and decided to add a rectifier and ground bed to be designated as M-8.5.  Koch also knew it needed to replace the ground bed at M-9 because it was depleted.  Koch continued to be aware that the M-9 rectifier was down and not protecting the pipeline near the rupture site in March 1996, May 1996 and July 1996.

43.     Although Koch knew the Sterling I pipeline near the rupture site was not being protected, it failed to add a rectifier and ground bed at M-8.5 or replace the ground bed at M-9 prior to the explosion because of the cost of doing so. Indeed, Koch was aware of the dangerous condition of the Sterling I pipeline near the rupture site for at least twelve to fifteen months prior to the explosion, but still continued to operate the pipeline at maximum operating pressure.

44.     The rupture of the Sterling I pipeline was 12.5 inches long, with an area of corrosion at least 5 inches long by 3 inches wide.  In the rupture area, corrosion pits substantially penetrated the pipe wall indicating nearly 100 percent wall thickness loss.  Although coating on the section of the pipeline which ruptured was destroyed by the fire, an inspection of several sections of the pipe extracted near the rupture site all revealed disbonded, cracked and damaged tape coating.  Less than twenty days after the explosion, Koch added a rectifier at M-8.6 (previously designated as M-8.5)and replaced the ground bed at M-9.

45.     The National Transportation Safety Board ("NTSB") concluded that the probable cause of the explosion in Kaufman County, Texas was the failure of Koch to adequately protect its pipeline from corrosion.   Findings of the NTSB included the following: (a) inadequate corrosion

PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT - PAGE 14                    366498.1 1761/1

protection at the rupture site and at numerous other locations on the pipeline allowed active corrosion to occur before the accident; (b) because cathodic protection levels were inadequate, the stress cracks that existed in the coating created areas in which rapid corrosion could occur; (c) disbonded tape coating most likely created locally shielded areas on the pipe that prevented adequate cathodic protection current from reaching its surface, creating other areas in which rapid corrosion could occur; (d) although Koch's records contained information that cathodic protection levels were inadequate and that active corrosion was occurring on its pipeline system before the accident, the conditions went uncorrected; (e) the tape coating on Koch's entire pipeline may have tape cracking and disbondment; (f) the format and content of the public education bulletin mailed by Koch did not effectively convey important safety information to the public; and (g) Koch's distribution program for its public education materials was inadequate. The NTSB also recommended that Koch evaluate the integrity of the remainder of the Sterling I pipeline, including the condition of the tape coating on the entire Sterling I pipeline, and make such repairs of the pipeline as necessary.

46.     Koch's policy and pattern of cutting costs to increase profits regardless of pipeline integrity and safety has caused other disastrous results. For example, the United States and several of its federal agencies maintained that 55,000 barrels or 2.3 million gallons of oil spilled from Koch's crude oil pipelines in navigable waters in the States of Texas, Oklahoma, Louisiana, Kansas, Missouri and Alabama during the years of 1990 through 1995. The United States filed two suits asserting that approximately 300 leaks from or ruptures of Koch's crude oil pipelines occurred because of Koch's poor maintenance of their pipelines, the severe corrosion of the Koch's pipelines, and Koch's failure to comply with the Clean Water Act. The United States also alleged that ruptures

and spills from Koch's crude oil pipelines were continuing.  The government sought recovery of statutory penalties and injunctive relief against Koch.

47.    Experts for the United States opined that the ruptures of Koch's crude oil pipelines occurred because: (a) Koch failed to operate the pipeline system in a reasonable and prudent manner; (b) the majority of Koch's pipeline spills were attributed to corrosion; (c) the percentage of pipeline spills due to corrosion indicated a long-term corrosion problem within Koch's pipeline system and leak prevention program; (d) Koch's pipeline assessment program indicated deficiencies in Koch's corrosion prevention, personnel training, pipeline depths and over-pressure prevention within its pipeline systems; (e) the average volume quantity per spill release has increased over time indicating leaks are occurring in pipelines with higher flow volumes; (f) Koch failed to adhere to regulations implemented under the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* regarding external corrosion control; (g) Koch failed to monitor the rate of internal corrosion of their pipelines; (h) Koch's own internal pipeline assessment program estimated costs totaling $98 million to recondition its pipelines to industry standards reflecting the inadequate condition of its pipeline system; and (i) Koch was deficient in the adequacy of its pre-acquisition investigation of pipeline systems they acquired.

48.    The United States' experts also concluded that Koch was aware of the extensive leaks that were caused by corrosion at least seven years before Koch performed its pipeline assessment program.  It was the further conclusion of the government's experts that Koch performed an economic evaluation as a result of its pipeline assessment program and decided to sell off many of its poorly conditioned crude oil pipelines rather than shutting them down or expending the costs to recondition the pipelines to industry standards.

366498.1 1761/1

49.    The United States recently settled its Clean Water Act claims against Koch for approximately 35 million dollars.  As part of the settlement, Koch also agreed to a Consent Decree in which the United States District Court for the Southern District of Texas, Houston Division, retains jurisdiction over the operation and maintenance of Koch's crude oil pipelines, although the court's jurisdiction does not relieve Koch from its duty to comply with the Pipeline Safety Act and the regulations implemented in accordance with such Act.  With respect to its crude oil pipelines, Koch is required to take the following action pursuant to the Consent Decree: (a) conduct inspections of its crude oil pipelines; (b) complete the development and implementation of leak detection and leak prevention programs for its crude oil pipelines; and (c) complete the development and implementation of a maintenance and inspection program for its crude oil pipelines.  The Consent Decree also provides that Koch's compliance shall be audited by an independent third-party auditing firm, and Koch shall not sell, lease or otherwise transfer any crude oil pipelines without making available all material operations and maintenance records in Koch's possession or control regarding the condition of such pipelines.

50.    At a news conference held by the Environmental Protection Agency (EPA) regarding the approximately 300 ruptures and spills from Koch's crude oil pipelines, Carol Browner, former Administrator of the EPA, stated that "they [Koch] simply did not believe the law applied to them."

51.    Investigations of Koch's pipelines and pipeline facilities have been conducted by federal and state authorities based on the corroded and dangerous condition of Koch's pipelines and based on Koch's under-reporting and/or false reporting of spills, leaks and ruptures.  For example, in 1994 Koch's crude oil pipeline in Corpus Christi spilled approximately 90,000 gallons of oil into the area's fishery causing substantial damage.  Koch originally reported that only 420 gallons of oil

had been released. Koch's report that only 420 gallons of oil leaked or spilled in Corpus Christi in 1994, initially prompted only a minimal clean up response. Thereafter, rains and wind quickly carried the massive amount of oil (90,000 gallons) down a creek and into the fishery-rich bays. Thus, while the dangerous condition of Koch's pipeline in Corpus Christi caused substantial damage, such damage was exacerbated by Koch's failure to accurately report the size of the spill. Similarly, in 1992, a corrosion hole was discovered in Defendants' pipeline in Minnesota, revealing that approximately 630,000 gallons of gas had spilled or leaked.

52.     Recently, a federal grand jury in Texas returned a 97-count indictment against Koch Industries, Inc., Koch Petroleum Group, L.P., and four employees (also collectively referred to as "Koch") charging that they violated federal environmental laws at a Corpus Christi refinery and made false statements to the Texas Natural Resource Conservation Commission (TNRCC). Again, Koch's conduct leading up to the federal indictment shows its history of failing to correct a known environmental hazard because of the cost of doing so, and the extent to which Koch will go to conceal its lack of compliance with environmental and safety regulations.

53.     According to the original federal indictment, Koch was limited by law to allowing emission wastes of not more than six megagrams of uncontrolled benzene per year at its West Plant or Corpus Christi refinery. (A megagram equals a metric ton or approximately 2,200 pounds.) The federal indictment charged that in January 1995, Koch put into operation a Thermatrix oxidizer, a control device that when working effectively acts like a high-temperature furnace meant to neutralize benzene converting it into carbon dioxide and water. The Thermatrix did not have the capacity to handle all the benzene the plant produced. As a result, Koch built bypass stacks to vent benzene vapors directly into the atmosphere without going through a purification system.

54.     The federal indictment alleged that to cover up the Thermatrix failures, an in-house Koch attorney (who later became the environmental manager at the refinery and was named individually in the indictment), told employees to call the repeated Thermatrix failures "upsets" to conceal the fact that the Thermatrix lacked sufficient capacity to serve as a control device to destroy benzene emissions. In April and August 1995, Koch filed quarterly reports on benzene compliance with the TNRCC and purposely concealed the refinery's benzene emissions. The quarterly reports also concealed the fact that Koch had not run any tests to determine how much benzene the plant was releasing. Although Koch management was aware of the filing of these false reports, they did not revise the reports or cause the reports to be revised. In May 1995, raw data indicated the refinery had exceeded its yearly six megagram limit for benzene emissions but Koch made a conscious decision to continue operating the refinery without taking any steps to correct the problem. In September 1995, Koch's in-house attorney hired an environmental consulting firm to evaluate whether the plant was in compliance with benzene regulations. In October 1995, the firm advised Koch that it had exceeded its yearly six megagram limit for 1995.

55.     The federal indictment alleged that in January 1996, Koch was aware that the refinery had released 91 megagrams of uncontrolled benzene, 85 megagrams more than the annual six megagram limit. The indictment charged that the following month Koch met with the TNRCC on at least two occasions and made false statements about the refinery's benzene emissions. The federal indictment further alleged that in April 1996, Koch submitted its annual benzene compliance report for 1995 to the TNRCC which stated that the plant released just 0.61 megagrams total of uncontrolled benzene. The indictment claimed that Koch made these false statements to the TNRCC

even though it had known for a considerable time that the refinery's uncontrolled benzene emissions grossly exceeded the yearly six megagram limit.

56.    According to the original federal indictment, a technician who had worked for Koch since 1991 was assigned to prepare the annual benzene compliance report for the TNRCC.  When the technician discovered that the report that was submitted to the TNRCC did not reflect Koch's lack of compliance with the six megagram  limit, she reported same to her bosses.  On April 16, 1996, the technician advised the TNRCC of Koch's false benzene compliance report. The technician eventually left her employment with Koch on July 31, 1996, and filed a wrongful termination suit against Koch in 1997 alleging that Koch retaliated against her for complaining about and disclosing the false benzene compliance report. The TNRCC's investigation of Koch's benzene emissions and the federal indictment against Koch resulted from the technician's disclosure of Koch's actual benzene emissions, the false report and Koch's deceptions.

57.    The original indictment further alleged that Koch failed to report the release of "reportable" quantities of benzene to the National Response Center (NRC), an agency of the United States. The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, makes it a criminal offense for a facility to fail to immediately notify the NRC as soon as the facility operator has knowledge of an unpermitted release of a hazardous substance in excess of a "reportable" quantity.  The EPA established the "reportable" quantity of benzene as ten pounds within a 24 hour period, based upon benzene's potential for causing cancer.

58.    The federal indictment alleged that by at least October 1995, Koch had certain Performance Testing data for the Thermatrix oxidizer which established that at least 24 pounds of benzene per hour were entering the vent stream intending to be processed.  The indictment alleged

PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT - PAGE 20                    366498.1 1761/1

that on 44 days between July 1995 through December 1995 "reportable" quantities of benzene were released into the atmosphere, information which was made available to Koch based on the assembly of data for filing quarterly reports. The indictment alleged that in direct contravention of the criminal statute under the CERCLA, Koch failed to report these releases of "reportable" quantities of benzene to the NRC as soon as Koch had knowledge of the releases.

59.    The federal indictment alleged that money or increased corporate profits was again Koch's motivation for failing to correct and for purposely concealing an environmental hazard and lack of compliance with regulations. Consistent with Koch's history of sacrificing safety and environmental protection for increased profits, the United States alleged that Koch concealed material facts related to benzene emissions to avoid the loss of profits that would result if the refinery were shut down until it could meet the requirements of the benzene emission standards. Specifically, the original federal indictment stated that "[i]t was further an object of the conspiracy to avoid or delay the financial expenditures necessary to comply with the law and to avoid shutting down the West Plant until it could be brought into compliance with the benzene [emission standards] so as to maximize corporate profits." The United States further alleged that Koch made approximately $251 million in profits in 1995 and 1996 from the operation of its Corpus Christi refineries.

60.    The federal indictment also alleged "[i]t was an object of the conspiracy to prevent the EPA, the TNRCC and the citizens of Nueces County, Texas, from learning that the West Plant was being operated without complying with the benzene [emission standards], and that the West Plant was emitting benzene into the atmosphere in violation of the law."[1]

_____

[1] On or about January 11, 2001, a Superseding Indictment was filed against Koch and its four employees relating to the operation of the Corpus Christi refinery. The Superseding Indictment narrowed the criminal charges to nine counts but did not alter the core charges or allegations of the United States

PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT - PAGE 21                    366498.1 1761/1

61.     On April 9, 2001, Koch Petroleum Group, L.P. pled guilty to one count before the Honorable Janis Graham Jack of the United States District Court for the Southern District of Texas, Corpus Christi Division. In pleading guilty, Koch Petroleum Group, L.P. admitted that it "did knowingly and willfully falsify, conceal and cover up by a trick, scheme and device, materials facts in a matter within the jurisdiction of the Texas Natural Resources Conservation Commission and the United States Environmental Protection Agency, to wit, the fact that a control device, the flameless thermal oxidizer known as the Thermatrix, had been disconnected from the Edens separator, a source of benzene vapors, and the fact that defendant [Koch Petroleum Group, L.P.] had failed to measure the level of benzene entering the aeration basin at the West Plant."

62.     With respect to its guilty plea, Koch Petroleum Group, L.P. received 5 years probation and agreed to pay a fine of $10,000,000 and perform community service pursuant to § 8B1.3 of the Federal Sentencing Guidelines and 18 U.S.C. § 3553(a). To fulfill this obligation, Koch Petroleum Group, L.P. agreed to pay an additional $10,000,000 to the clerk of the United States District Court as community service funds to be used for air or water quality remediation projects in and around the city of Corpus Christi, Texas. Koch Petroleum Group, L.P. also agreed that it "will not seek any reduction in its tax obligations as a result of its payment, and that it will not characterize, publicize, or refer to the payment as anything other than a community service payment made as a condition of probation incidental to a criminal conviction."

---

against Koch and its employees. Prior to the trial date, the United States reduced the charges to seven counts.

366498.1 1761/1

63.     In exchange for the guilty plea of Koch Petroleum Group, L.P., the United States agreed to dismiss the original indictment and the superseding indictment against Koch Industries, Inc., Koch Petroleum Group, L.P., and the four Koch employees.

64.     Koch also recently settled a suit with the United States in which a jury found that Koch committed over 24,000 violations of the False Claims Act in the reporting of measurements of oil purchases. That suit alleged that Koch made these under-reports or false claims in order to increase its monetary gain and estimates that profits realized by Koch from these false claims exceeded $230 million.

65.     Koch's policy and pattern of cutting costs to increase profits regardless of safety concerns or federal regulations has resulted in the corrosion of Koch's natural gas and hazardous liquid pipelines. The dangerous condition of Koch's natural gas and hazardous liquid pipelines and Koch's failure to safely maintain and operate their pipelines continues to present a serious and imminent danger of further failures, leaks, ruptures, fires and/or explosions.

66.     Koch has known for years that its pipelines contain corroded and damaged portions that will likely cause failures, leaks, ruptures and/or spills. Further, Koch knowingly operates its pipelines below the minimum safety standards and regulations prescribed by federal law. Koch has chosen not to correct the pipelines' problems and dangerous condition, and has chosen not to operate its pipelines in full compliance with federal law because of the costs associated with doing so.

67.     Koch's common pattern, practice and scheme of failing to safely maintain and operate its natural gas and hazardous liquid pipelines to save money and increase profitability is applicable to Plaintiff and the class members and exposes Plaintiff and the class members to imminent risk of harm.

68.     Plaintiff and the class members are at further risk of harm as a result of Koch's lack

of compliance with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations

implementing such Act because the federal agency charged with monitoring the safety of Koch's

natural gas and hazardous liquid pipelines has failed to do so.

69.     The Office of Pipeline Safety (OPS) is the federal agency responsible for regulating

and monitoring the pipeline industry.    OPS is part of the Research and Special Projects

Administration of the United States Department of Transportation (DOT).   The OPS has only 55

inspectors nationwide.   Since 1990, there have been nearly 4,000 incidents reported to OPS

involving gas and hazardous liquid pipelines, more than one every single day.

70.     Former National Transportation Safety Board Chairman James E. Hall has accused

the OPS of adopting rules that are "too little, too late" to safeguard the public.  Testifying before

Congress, Jim Hall has stated that the "lack of action" by the OPS "continues to place the American

people at risk."  Former NTSB Chairman Hall stated that the OPS has one of the worst records in

implementing NTSB safety recommendations, 68.9 percent, and that several such recommendations

made in 1992 are still not implemented.  The OPS has spent 6 years attempting to construct a

national pipeline map but has not completed the task yet.  In other words, the OPS does not even

know the location of all pipelines that run through the United States.  Former NTSB Chairman Hall

has also stated that he would give the OPS "a big fat F on everything they've done."  Thus, the

federal agency charged with the responsibility of monitoring the safety of Koch's natural gas and

hazardous liquid pipelines has failed to do so and  clearly lacks the resources to do so in the

immediate future.

71.     The DOT and/or OPS are not diligently pursuing administrative proceedings for Koch's violations of the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the regulations implementing such Act with respect to Koch's natural gas and hazardous liquid pipelines.

## VI.
## Class Action Allegations

72.     Plaintiff brings this suit not only on his own behalf and the Trust, but pursuant to Federal Rule of Civil Procedure 23, as representative of a class of similarly situated individuals and entities who are exposed to imminent risk of harm and whose properties have been damaged and continue to be damaged due to the dangerous condition of Koch's natural gas and hazardous liquid pipelines and Koch's failure to safely maintain and operate such pipelines.

73.     The Plaintiff class is defined as follows:

a.      All persons and entities owning property through which Koch's natural gas and hazardous liquid pipelines run.

b.      Specifically excluded from the class are all currently serving justices, judges, and magistrate judges of the United States and their current spouses, and all persons (and their current spouses) within the third degree of relationship to such justices, judges, magistrate judges, and spouses.

c.      Also excluded from the class are all employees, agents, officers, directors, and affiliates of Koch.

74.     Members of the class are so numerous that joinder of all members is impracticable.

75.     Koch's failure to inspect, test, maintain, repair and safely operate its natural gas and hazardous liquid pipelines in violation of the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act based upon Koch's centralized policy of Market-Based Management® constitutes a common course of conduct as to Plaintiff and as to each class member.

76.    Questions of fact and law common to Plaintiff and to all class members include but are not limited to the following:

a.    Whether Koch is failing to inspect, test, repair, maintain and/or operate its natural gas and hazardous liquid pipelines in compliance with the Pipeline Safety Act and prescribed regulations implementing such Act; and

b.    Whether Plaintiff and the class members are entitled to injunctive relief under the Pipeline Safety Act and/or any other applicable law requiring Koch to conduct such repairs, replacements, maintenance, testing, retro-fitting, inspection, close interval surveys and/or surveillance of Koch's natural gas and hazardous liquid pipelines as to comply with the safety standards and regulations prescribed by federal law to prevent damage to the property of the Trust and the class members and to eliminate Plaintiff's and the class members' exposure to an imminent risk of harm.

77.    The claims of Plaintiff are typical of the claims of the class members. The claims have the same essential characteristics as the claims of the class as a whole and are based upon identical legal theories. The members of the class have suffered the harm and possess the same interests as Plaintiff. Further, based on the conduct of Koch and the claims of Plaintiff and the class members, a single resolution of the claims would be preferable to a multiplicity of similar actions.

78.    Plaintiff will fairly and adequately protect the interests of the class members. Plaintiff is committed to the vigorous prosecution of this action and has retained counsel who are experienced and competent. Plaintiff has no interests antagonistic to those of the class members.

79.    Koch has failed to perform its duty to safely maintain and operate its natural gas and hazardous liquid pipelines in a manner generally applicable to Plaintiff and the class members.

80.    Final relief of an injunctive nature is appropriate as to Plaintiff and the class members as a whole.

81.    This action is maintainable pursuant to Federal Rule of Civil Procedure 23(b)(2).

PLAINTIFF P.D. HAMILTON'S ORIGINAL COMPLAINT - PAGE 26                    366498.1 1761/1

VII.
Causes of Action

A.     Violation of the Pipeline Safety Act

82.     Plaintiff is entitled to pursue a private cause of action on his behalf, the Trust and the class members against Koch for injunctive relief under the Pipeline Safety Act which states that "[a] person may bring a civil action in an appropriate district court of the United States for an injunction against another person . . . for a violation of this chapter or a regulation prescribed or order issued under this chapter." 49 U.S.C. § 60121(a).

83.     In compliance with Section 60121(a)(1)(A) of the Pipeline Safety Act, Plaintiff has given the United States Secretary of Transportation and Koch notice of Koch's violations under the Pipeline Safety Act and the prescribed regulations implementing such Act. *A copy of Plaintiff's notice letter to the United States Secretary of Transportation and Koch is attached hereto as Exhibit "A."*

84.     As a direct result of its corporate policy of Market-Based Management®, Koch has failed and continues to fail to maintain, inspect, test, repair and operate its hazardous liquid pipelines in accordance with the minimum standards required by the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act (49 C.F.R. § 195). Koch's violations include but are not limited to:

1.     Operating or maintaining its pipeline system at a level lower than the minimum requirements set forth in the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the federal regulations implementing such Act;

2.     Failing to correct unsafe conditions of its pipelines upon discovery within a reasonable time;

3. Continuing to operate its pipelines in an unsafe condition even though the condition of the pipelines presents an immediate hazard;

4. Failing to report unsafe conditions of its pipelines as required by federal law, including the failure to report general corrosion that has reduced the wall thickness to less than that required for the maximum operating pressure, and localized corrosion pitting to a degree where leakage might result;

5. Failing to prepare and follow a manual of written procedures for the operation and maintenance of its pipelines and for handling emergencies, and failing to review such manual to insure the written procedures are effective;

6. Failing to establish a program to train workers and employees to carry out their duties, recognize conditions likely to cause emergencies, take steps to control releases, recognize hazards of the product, and failing to make changes to a training program to insure it is effective;

7. Failing to maintain appropriate maps and records of each repair made to the pipelines for the life of the pipelines;

8. Failing to maintain appropriate maps and records of each inspection and test of the pipelines required for at least two (2) years or until the next inspection or test is performed, whichever is longer;

9. Operating the pipelines at a pressure that exceeds the pipeline design or eighty percent of any hydrostatic test;

10. Operating its pipeline system without the required cathodic protection;

11. Failing to maintain proper external corrosion control, including failing to conduct annual tests for adequate protection, failing to maintain test leads, failing to inspect cathodic protection rectifiers/beds, failing to study leak records to determine if cathodic protection is adequate, failing to examine pipe for external corrosion and/or the extent of corrosion, failing to replace or reduce operating pressure where general corrosion is present, and failing to replace or reduce operating pressure where local corrosion is present;

12. Failing to maintain proper internal corrosion control;

13. Failing to insure that repairs are made in a safe manner and are made so as to prevent damage to persons or property;

366498.1 1761/1

14.    Failing to establish a program to enable the public to recognize a pipeline emergency and to teach the public the appropriate action to be taken in the event of a pipeline emergency;

15.    Failing to replace, repair or remove from service each segment of the pipelines that become unsafe;

16.    Failing to properly maintain repair records for the pipelines;

17.    Failing to take immediate temporary measures to protect the public from leaks, imperfections or damage to the pipelines;

18.    Failing to follow prescribed methods for the proper repair of leaks in the pipelines;

19.    Failing to maintain appropriate dispersal exclusion zones to protect nearby properties from hazardous leaks and vapor clouds;

20.    Failing to take positive action to mitigate and control the effects of corrosion after a condition of active external corrosion is found; and

21.    Failing to repair hazardous leaks in its pipeline system.

85.    As a direct result of its corporate policy of Market-Based Management®, Koch has

also failed and continues to fail to maintain, inspect, test, repair and operate its natural gas pipelines

in accordance with the minimum standards required by the Pipeline Safety Act, 49 U.S.C. § 60101

*et seq.* and the prescribed regulations implementing such Act (49 C.F.R. § 192). Koch's violations

include but are not limited to:

1.    Operating or maintaining its pipeline system at a level lower than the minimum requirements set forth in the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the federal regulations implementing such Act;

2.    Failing to correct unsafe conditions of its pipelines upon discovery within a reasonable time;

3.    Failing to follow one-call procedures and pipeline right-of-way patrolling procedures;

4.    Continuing to operate its pipelines in an unsafe condition even though the condition of the pipelines presents an immediate hazard;

5.    Failing to report unsafe conditions of its pipelines as required by federal law, including the failure to report general corrosion that has reduced the wall thickness to less than that required for the maximum operating pressure, and localized corrosion pitting to a degree where leakage might result;

6.    Failing to prepare and follow a manual of written procedures for the operation and maintenance of its pipelines and for handling emergencies, and failing to review such manual to insure the written procedures are effective;

7.    Failing to establish a program to train workers and employees to carry out their duties, recognize conditions likely to cause emergencies, take steps to control releases, recognize hazards of the product, and failing to make changes to a training program to insure it is effective;

8.    Failing to maintain appropriate maps and records of each repair made to the pipelines for the life of the pipelines;

9.    Operating its pipeline system without the required cathodic protection;

10.   Failing to maintain proper external corrosion control, including failing to conduct annual tests for adequate protection, failing to maintain test leads, failing to inspect cathodic protection rectifiers/beds, failing to study leak records to determine if cathodic protection is adequate, failing to examine pipe for external corrosion and/or the extent of corrosion, failing to replace or reduce operating pressure where general corrosion is present, and failing to replace or reduce operating pressure where local corrosion is present;

11.   Failing to insure that repairs are made in a safe manner and are made so as to prevent damage to persons or property;

12.   Failing to establish a program to enable the public to recognize a pipeline emergency and to teach the public the appropriate action to be taken in the event of a pipeline emergency;

13.   Failing to replace, repair or remove from service each segment of the pipelines that become unsafe;

14.   Failing to maintain external protective coating on buried and/or submerged pipelines;

15. Failing to have adequate cathodic protection on buried and/or submerged pipelines;

16. Failing to take positive action to mitigate and control the effects of corrosion after a condition of active external corrosion is found;

17. Failing to establish schedules for the application of corrosion control and to monitor the effectiveness of corrosion control before the effects of the corrosion become a public hazard or endanger public safety;

18. Failing to examine any portion of a buried pipeline that has become exposed for evidence of external corrosion and to take remedial action when external corrosion is found on a buried pipeline that has become exposed;

19. Failing to properly apply protective coating to the pipeline for the purpose of external corrosion control;

20. Failing to inspect internal surface for evidence of corrosion whenever pipe is removed from a pipeline, including failing to investigate adjacent pipe to determine the extent of internal corrosion, failing to replace pipe as required, and failing to minimize the internal corrosion;

21. Failing to perform and/or maintain records of tests, surveys, or inspections demonstrating the adequacy of corrosion control measures or that a corrosive condition does not exist;

22. Failing to properly test for, isolate, and eliminate hazardous leaks on relocated and replaced pipeline;

23. Failing to perform and maintain records of testing of pipelines which would demonstrate, among other things, pressure readings, elevation variations, leaks and failures noted, as well as disposition of those leaks and failures;

24. Failing to effectuate continuing surveillance of pipelines and failing to take appropriate action concerning failures, leakage, corrosion, changes in cathodic protection, and other unusual operating and maintenance conditions;

25. Failing to have a program to recondition and phase out the segments of pipe when the segments cannot be reconditioned and in failing to reduce the maximum allowable operating pressure; and

26. Failing to repair hazardous leaks in its pipeline system.

366498.1 1761/1

86.     Koch's failure to inspect, test, maintain and operate its natural gas and hazardous liquid pipelines in compliance with the Pipeline Safety Act and prescribed regulations exposes Plaintiff and the class members to an imminent risk of harm and has caused and continues to cause damage to the property of the Trust and the class members.

87.     Pursuant to Section 60121 of the Pipeline Safety Act, Plaintiff seeks injunctive relief to prevent further damage to the property of the Trust and the property of the class members and to eliminate Plaintiff's and the class members' exposure to an imminent risk of harm, including requiring Koch to conduct such inspections, testing, close interval surveys and surveillance, repairs, replacements, maintenance and/or retro-fitting of their pipelines as to comply with and satisfy the Pipeline Safety Act and prescribed regulations.

## VIII.
## Relief

88.     Pursuant to Section 60121 of the Pipeline Safety Act, Plaintiff and the class members seek injunctive relief to prevent further damage to their property and to eliminate Plaintiff's and the class members' exposure to an imminent risk of harm, including requiring Koch to conduct such repairs, maintenance, testing, retro-fitting, inspections, close interval surveys and/or surveillance of their pipelines as to comply with safety standards and regulations prescribed by federal law.

WHEREFORE, PREMISES CONSIDERED, Plaintiff P.D. Hamilton, individually and as Trustee of the Prentice Dell Hamilton and Florine Hamilton Family Trust, and all those similarly situated, respectfully prays for the following relief:

a.      Certification of this case as a class action under Federal Rule of Civil Procedure 23(b)(2);

b.      Injunctive relief from the Court requiring Defendants to conduct such inspections, testing, close interval surveys and surveillance, repairs,

366498.1 1761/1

replacements, maintenance and/or retro-fitting of their hazardous liquid and natural gas pipelines and pipeline facilities as to satisfy and comply with the Pipeline Safety Act and all safety standards and regulations prescribed by federal law;

c.     Attorney's fees, expenses, and costs of court incurred in connection with the litigation of this matter;

e.     Prejudgment and post-judgment interest; and

f.     Such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

**McCAULEY, MACDONALD, DEVIN & HUDDLESTON, P.C.**

By: _R. Michael McCauley_

**R. Michael McCauley**
Attorney-In-Charge
State Bar No. 13383500
**Amy S. Harris**
State Bar No. 09050850
3800 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 744-3300
(214) 747-0942 (Facsimile)

**LAW OFFICES OF FRED MISKO, JR., P.C.**
**Fred Misko, Jr.**
State Bar No. 14204000
**John Volney**
State Bar No. 24003118
**Ed Chin**
State Bar No. 50511688
Turtle Creek Centre, Suite 1000
3811 Turtle Creek Boulevard
Dallas, Texas 75219
(214) 443-8000
(214) 443-8010 (Facsimile)

**CHANDLER LAW OFFICES**
**George E. Chandler**
State Bar No. 04094000
207 East Frank, Suite 105
Lufkin, Texas 75902-0340
(936) 632-7778
(936) 632-1304 (Facsimile)

√ **Samuel Issacharoff**
State Bar No. 00785352
435 West 116th St.
New York, New York  10027
(212) 854-2527
(212) 854-7946 (Facsimile)

√ **Arthur R. Miller**
Board of Bar Overseers No. 554226
1545 Massachusetts Avenue
Cambridge, Massachusetts  02138
(617) 495-4111
(617) 495-9191 (Facsimile)

**BRANTON & HALL**
**James L. Branton**
State Bar No. 00000069
711 Navarro Street
737 Travis Park Plaza Bldg.
San Antonio, Texas  78205-1787
(210) 224-4474
(210) 224-1928 (Facsimile)

**LAW OFFICE OF CLAYTON E. DARK, JR.**
**Clayton E. Dark, Jr.**
State Bar No. 05384500
207 E. Frank St., Suite 100
P. O. Box 2207
Lufkin, Texas 75902-2207
(936) 637-1733
(936) 637-2897 (Facsimile)

**WELCH & TUNNELL**
**Claude E. Welch**
State Bar No. 21120500
**John Tunnell**
State Bar No. 20292100
115 W. Shepherd Avenue
Lufkin, Texas 75904
(936) 639-3311
(936) 639-3049 (Facsimile)

**ATTORNEYS FOR PLAINTIFF
AND THE CLASS MEMBERS**

# McCauley, Macdonald, Devin & Huddleston

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS
3800 RENAISSANCE TOWER
1201 ELM STREET
DALLAS, TEXAS 75270-2014

R. Michael McCauley

(214) 744-3300

TELECOPIER (214) 747-0942

June 5, 2001

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
400 7th Street S.W.
Washington, D.C.  20590

*Via Certified Mail, Return Receipt*
*#7099 3220 0008 4869 0902*

Re:     **Notice of Violations and Intent to File Suit Pursuant To**
**49 U.S.C. § 60121(a)(1)(A) of the Pipeline Safety Act**

Dear Secretary Mineta:

This law firm represents P.D. Hamilton, individually and as Trustee of the Prentice Dell Hamilton and Florine Hamilton Family Trust (sometimes referred to as the "Trust"), with respect to any claims he and the Trust may have against Koch Industries, Inc., individually and doing business as Koch Hydrocarbon Company, Koch Pipeline Company, L.P., Koch Pipeline Company, L.L.C., Gulf South Pipeline Company, L.P., GS Pipeline Company, L.L.C., Entergy-Koch, L.P. and EKLP, L.L.C. (hereinafter collectively referred to as "Koch") resulting from Koch's operation of its natural gas and hazardous liquid pipelines. P.D. Hamilton is also represented by Fred Misko, Jr. with the Law Offices of Fred Misko, Jr., P.C., George E Chandler with the Chandler Law Offices, Samuel Issacharoff, Arthur R. Miller, James L. Branton with the law offices of Branton & Hall, Clayton E. Dark, Jr. with the Law Office of Clayton E. Dark, Jr., and Claude E. Welch and John Tunnell with the law firm of Welch & Tunnell.

The Prentice Dell Hamilton and Florine Hamilton Family Trust owns property in Trinity County, Texas through which Koch's hazardous liquid pipeline runs. The pipeline which transverses the property of the Trust transports highly volatile liquefied gas.

P.D. Hamilton also represents a class of similarly situated individuals and entities who own property through which Koch's natural gas and hazardous liquid pipelines run in the States of Texas, Oklahoma, Kansas, Louisiana, Alabama, Mississippi and Florida. Koch's natural gas and hazardous liquid pipelines are governed by the Hazardous Liquid Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* (hereinafter the "Pipeline Safety Act") and the federal regulations implementing such Act.

**Exhibit**
**A**

366499.1 1761/1

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 2

Koch has engaged and is continuing to engage in a common pattern, practice and scheme of failing to safely maintain and operate its natural gas and hazardous liquid pipelines to maximize corporate profits. Koch follows a policy called market-based management, the purpose of which is to avoid or delay financial expenditures necessary to comply with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act to increase its corporate profits. As a result of this company-wide policy and practice, Koch's natural gas and hazardous liquid pipelines have seriously deteriorated in condition and expose P.D. Hamilton and the class members to imminent risk of harm. Further, the dangerous condition of Koch's natural gas and hazardous liquid pipelines has caused and is continuing to cause damage to the property of the Trust, P.D. Hamilton and the class members.

Virtually all decisions made by Koch regarding the maintenance and operation of its natural gas and hazardous liquid pipelines are based upon market-based management. These decisions include those relating to the detection and prevention of corrosion of their natural gas and hazardous liquid pipelines, as well as the repair and replacement of its pipelines.

Koch's strict adherence to market-based management is directly opposed to a management program which emphasizes pipeline integrity and compliance with the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the prescribed regulations implementing such Act. Because Koch imposes and follows a company-wide policy emphasizing corporate profits over pipeline integrity, Koch's natural gas and hazardous liquid pipelines expose P.D. Hamilton and the class members to imminent risk of harm.

Koch's failure to safely maintain and operate its hazardous liquid pipelines in order to cut costs and ensure higher corporate profits has resulted in the corrosion of Koch's natural gas and hazardous liquid pipelines and has caused numerous leaks, spills, failures and/or ruptures in Koch's pipelines.

Koch is operating its pipelines in violation of the Pipeline Safety Act and the federal regulations implementing such Act. Section 60121(a)(1) of the Pipeline Safety Act states in pertinent part that "[a] person may bring a civil action in an appropriate district court of the United States for an injunction against another person . . . for a violation of this chapter or a regulation prescribed or order issued under this chapter." Section 60121(a)(1)(A) states that the person may bring the action after the person has given notice of the violation to the Secretary of Transportation and to the person alleged to have committed the violation.

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 3

---

        With respect to its hazardous liquid pipelines, Koch's violations include but are not limited to:

1.      Operating or maintaining its pipeline system at a level lower than the minimum requirements set forth in the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the federal regulations implementing such Act;

2.      Failing to correct unsafe conditions of its pipelines upon discovery within a reasonable time;

3.      Continuing to operate its pipelines in an unsafe condition even though the condition of the pipelines presents an immediate hazard;

4.      Failing to report unsafe conditions of its pipelines as required by federal law, including the failure to report general corrosion that has reduced the wall thickness to less than that required for the maximum operating pressure, and localized corrosion pitting to a degree where leakage might result;

5.      Failing to prepare and follow a manual of written procedures for the operation and maintenance of its pipelines and for handling emergencies, and failing to review such manual to insure the written procedures are effective;

6.      Failing to establish a program to train workers and employees to carry out their duties, recognize conditions likely to cause emergencies, take steps to control releases, recognize hazards of the product, and failing to make changes to a training program to insure it is effective;

7.      Failing to maintain appropriate maps and records of each repair made to the pipelines for the life of the pipelines;

8.      Failing to maintain appropriate maps and records of each inspection and test of the pipelines required for at least two (2) years or until the next inspection or test is performed, whichever is longer;

9.      Operating the pipelines at a pressure that exceeds the pipeline design or eighty percent of any hydrostatic test;

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 4

10.   Operating its pipeline system without the required cathodic protection;

11.   Failing to maintain proper external corrosion control, including failing to conduct annual tests for adequate protection, failing to maintain test leads, failing to inspect cathodic protection rectifiers/beds, failing to study leak records to determine if cathodic protection is adequate, failing to examine pipe for external corrosion and/or the extent of corrosion, failing to replace or reduce operating pressure where general corrosion is present, and failing to replace or reduce operating pressure where local corrosion is present;

12.   Failing to maintain proper internal corrosion control;

13.   Failing to insure that repairs are made in a safe manner and are made so as to prevent damage to persons or property;

14.   Failing to establish a program to enable the public to recognize a pipeline emergency and to teach the public the appropriate action to be taken in the event of a pipeline emergency;

15.   Failing to replace, repair or remove from service each segment of the pipelines that become unsafe;

16.   Failing to properly maintain repair records for the pipelines;

17.   Failing to take immediate temporary measures to protect the public from leaks, imperfections or damage to the pipelines;

18.   Failing to follow prescribed methods for the proper repair of leaks in the pipelines;

19.   Failing to maintain appropriate dispersal exclusion zones to protect nearby properties from hazardous leaks and vapor clouds;

20.   Failing to take positive action to mitigate and control the effects of corrosion after a condition of active external corrosion is found; and

21.   Failing to repair hazardous leaks in its pipeline system.

366499.1 1761/1

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 5

_____

With respect to its natural gas pipelines, Koch's violations include but are not limited to:

1.    Operating or maintaining its pipeline system at a level lower than the minimum requirements set forth in the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* and the federal regulations implementing such Act;

2.    Failing to correct unsafe conditions of its pipelines upon discovery within a reasonable time;

3.    Failing to follow one-call procedures and pipeline right-of-way patrolling procedures;

4.    Continuing to operate its pipelines in an unsafe condition even though the condition of the pipelines presents an immediate hazard;

5.    Failing to report unsafe conditions of its pipelines as required by federal law, including the failure to report general corrosion that has reduced the wall thickness to less than that required for the maximum operating pressure, and localized corrosion pitting to a degree where leakage might result;

6.    Failing to prepare and follow a manual of written procedures for the operation and maintenance of its pipelines and for handling emergencies, and failing to review such manual to insure the written procedures are effective;

7.    Failing to establish a program to train workers and employees to carry out their duties, recognize conditions likely to cause emergencies, take steps to control releases, recognize hazards of the product, and failing to make changes to a training program to insure it is effective;

8.    Failing to maintain appropriate maps and records of each repair made to the pipelines for the life of the pipelines;

9.    Operating its pipeline system without the required cathodic protection;

10.    Failing to maintain proper external corrosion control, including failing to conduct annual tests for adequate protection, failing to maintain test leads, failing to inspect cathodic protection rectifiers/beds, failing to study leak

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 6

---

records to determine if cathodic protection is adequate, failing to examine pipe for external corrosion and/or the extent of corrosion, failing to replace or reduce operating pressure where general corrosion is present, and failing to replace or reduce operating pressure where local corrosion is present;

11.   Failing to insure that repairs are made in a safe manner and are made so as to prevent damage to persons or property;

12.   Failing to establish a program to enable the public to recognize a pipeline emergency and to teach the public the appropriate action to be taken in the event of a pipeline emergency;

13.   Failing to replace, repair or remove from service each segment of the pipelines that become unsafe;

14.   Failing to maintain external protective coating on buried and/or submerged pipelines;

15.   Failing to have adequate cathodic protection on buried and/or submerged pipelines;

16.   Failing to take positive action to mitigate and control the effects of corrosion after a condition of active external corrosion is found;

17.   Failing to establish schedules for the application of corrosion control and to monitor the effectiveness of corrosion control before the effects of the corrosion become a public hazard or endanger public safety;

18.   Failing to examine any portion of a buried pipeline that has become exposed for evidence of external corrosion and to take remedial action when external corrosion is found on a buried pipeline that has become exposed;

19.   Failing to properly apply protective coating to the pipeline for the purpose of external corrosion control;

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 7

20.   Failing to inspect internal surface for evidence of corrosion whenever pipe is removed from a pipeline, including failing to investigate adjacent pipe to determine the extent of internal corrosion, failing to replace pipe as required, and failing to minimize the internal corrosion;

21.   Failing to perform and/or maintain records of tests, surveys, or inspections demonstrating the adequacy of corrosion control measures or that a corrosive condition does not exist;

22.   Failing to properly test for, isolate, and eliminate hazardous leaks on relocated and replaced pipeline;

23.   Failing to perform and maintain records of testing of pipelines which would demonstrate, among other things, pressure readings, elevation variations, leaks and failures noted, as well as disposition of those leaks and failures;

24.   Failing to effectuate continuing surveillance of pipelines and failing to take appropriate action concerning failures, leakage, corrosion, changes in cathodic protection, and other unusual operating and maintenance conditions;

25.   Failing to have a program to recondition and phase out the segments of pipe when the segments cannot be reconditioned and in failing to reduce the maximum allowable operating pressure; and

26.   Failing to repair hazardous leaks in its pipeline system.

Pursuant to 49 U.S.C. § 60121(a)(1)(A), P.D. Hamilton, individually and as Trustee of the Prentice Dell Hamilton and Florine Hamilton Family Trust, is filing a class action suit against Koch in the United States District Court for the Eastern District of Texas, Lufkin Division, seeking injunctive relief as a result of the dangerous condition of Koch's natural gas and hazardous liquid pipelines based on the list of violations set forth above.  Additionally, pursuant to Section 60121(a)(1) of the Pipeline Safety Act, P.D. Hamilton is also seeking injunctive relief to prevent further damage to the property of the Prentice Dell Hamilton and Florine Hamilton Family Trust and the property of the class members, and to reduce his and the class members' risk of harm, including requiring Koch to conduct such inspections, close interval surveys, surveillance, testing, repairs, maintenance, retro-fitting and replacements of its pipelines as to comply with federal regulations.

366499.1 1761/1

Mr. Norman Y. Mineta
U.S. Secretary of Transportation
Department of Transportation
June 5, 2001
Page 8

By copy of this letter and in further compliance with 49 U.S.C. § 60121(a)(1)(A), P.D. Hamilton is serving Koch with notice of his intention to seek injunctive relief under the Pipeline Safety Act, and based upon such other laws as are applicable, on behalf of himself, the Prentice Dell and Florine Hamilton Family Trust, and the class members.

Should you have any questions regarding this notice, please do not hesitate to contact me.

Sincerely,

R. Michael McCauley

cc:   Mr. Mitch Herren
      Koch Industries, Inc.
      P. O. Box 2256
      Wichita, Kansas 67201

*Via Certified Mail, Return Receipt*
*#7099 3220 0008 4869 0919*

366499.1 1761/1